**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| VIRGEN M. CORCINO-RODRÍGUEZ, et al., | |
| Plaintiffs, | |
| v. | CIVIL NO. 10-1405 (MEL) |
| STATE INSURANCE FUND CORPORATION, et al., | |
| Defendants. | |

**OPINION AND ORDER**

## I.   PROCEDURAL HISTORY

On May 14, 2010, plaintiffs Virgen M. Corcino Rodríguez ("Corcino") and Myriam Burgos Ocaña ("Burgos") (collectively, "plaintiffs") filed a complaint under 42 U.S.C. § 1983 against, *inter alios*, defendants State Insurance Fund Corporation ("SIFC"), Zoimé Álvarez Rubio ("Álvarez"), and Saúl Rivera Rivera ("Rivera") (collectively, "defendants"). ECF No. 1. Plaintiffs allege claims under the First Amendment for political discrimination, the Due Process Clause, and the Equal Protection Clause, as well as claims for violations of the Constitution and laws of the Commonwealth of Puerto Rico.[1]

On May 15, 2012, defendants filed a motion for summary judgment. ECF No. 80. On February 27, 2013, the case was stayed pending the Puerto Rico Supreme Court's disposition of the issue of the validity of internal job postings in a factually similar case. ECF No. 170. The motion for summary judgment was denied without prejudice. On March 19, 2013, the Puerto Rico Supreme Court reached its decision in González-Segarra v. Corporación del Fondo del

---

[1] Plaintiffs' equal protection claims have been dismissed with respect to all defendants. ECF No. 31.

<u>Seguro del Estado</u>, No. CC-2011-1051, 2013 WL 1395853 (P.R. Mar. 19, 2013).[2]  The stay was

lifted on April 1, 2013.  ECF No. 175.

Pending before the court is defendants' renewed motion for summary judgment, filed on

May 9, 2013.  ECF No. 192.  The court has also been presented with a response in opposition,

reply, and surreply.  ECF Nos. 206; 216; 244.  For the reasons set forth below, defendants'

motion is granted.

## II.    SUMMARY OF UNCONTESTED FACTS[3]

### A.    Professional Background of the Parties

#### 1.    Corcino

On December 16, 2003, Corcino began working at the SIFC, the Puerto Rico government

agency responsible for administrating the local workers' accident compensation program.  She

started as a transitory employee in the managerial Class of Positions of Compliance, Security and

---

[2] A certified translation of <u>González-Segarra</u> has been provided.  <u>See</u> ECF No. 189-1.  Plaintiffs have advised the court that two motions for reconsideration were submitted on April 4 and 8, 2013, respectively, to the Puerto Rico Supreme Court regarding its ruling in <u>González-Segarra</u>.  <u>See</u> ECF No. 195.  As of the date and filing of the instant opinion and order, the court is not aware of any ruling made by the Puerto Rico Supreme Court as to the motions for reconsideration.  Nevertheless, the existence of such motions does not prevent the issuance of the instant opinion and order under <u>Casiano-Montañez v. State Ins. Fund Corp.</u>, 707 F.3d 124 (1st Cir. 2013).  In <u>Casiano-Montañez</u>, the district court was "instruct[ed] to stay proceedings pending the Puerto Rico Supreme Court's decision in the <u>González Segarra</u> case."  707 F.3d at 130.  The <u>Casiano-Montañez</u> court stated that, "once the Puerto Rico Supreme Court 'has spoken, adjudication of any remaining constitutional questions may indeed become greatly simplified.'" <u>Id.</u> at 129 (quoting <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 80 (1997)).  The Puerto Rico Supreme Court has now issued its decision in <u>González-Segarra</u>, directly addressing the issue of the validity of internal job postings at the SIFC.  The "concern … that, absent a stay, the … court could be forced to decide the complex state law issue intertwined with the due process claim before the Puerto Rico Supreme Court issues its decision," <u>id.</u> at 129–30, is no longer applicable.  <u>Id.</u> at 129–30.

[3] Local Rule 56 "structures the presentation of proof at summary judgment."  <u>Goya Foods, Inc. v. Orion Distributors, Inc.</u>, Civ. No. 10-1168 (BJM), 2012 WL 1069191, at *1 (D.P.R. Mar. 29, 2012).  It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," <u>CMI Capital Market Inv. v. González Toro</u>, 520 F.3d 58, 63 (1st Cir. 2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record."  <u>Cabán Hernández v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 6–7 (1st Cir. 2007).  In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted.  Proposed facts which do not have citations which adequately support the propositions for which they are cited have been disregarded.  <u>See, e.g.</u>, ECF Nos. 193-1, ¶ 133; 206-2, ¶¶ 6, 23, 54, 74, 99–102, 106, 125.

Privacy Officer (HIPAA).[4]   Subsequently, Corcino submitted an application for a career managerial appointment for the position 6758 in the Class of Compliance, Security and Privacy Officer (HIPAA).   The position was announced by a job posting limited to current SIFC employees ("internal job posting").   Former employees did not receive notice of the postings and were not permitted to compete for the positions.   Corcino was selected for the position, effective June 16, 2004.  See ECF Nos. 193-1, ¶¶ 1, 10–12, 91, 151; 206-1, ¶¶ 1, 10–12, 91, 151; 216-1, tbl. A ¶¶ 11, 91, 151; 244, tbl. A ¶¶ 11, 91.

On May 1, 2005, Corcino was appointed to occupy the trust position of Special Aide II. The position was assigned to the Office of the SIFC Administrator.   In July 2008, Corcino resigned her trust position and requested reinstatement to the career managerial position 6758 in the Class of Compliance, Security and Privacy Officer (HIPAA).   Her reinstatement was effective on or around July 18, 2008.  See ECF Nos. 193-1, ¶¶ 13–14; 206-1, ¶¶ 13–14.

### 2.    Burgos

Burgos began working at the SIFC on July 3, 1989, as Director of Public Relations, a trust position.  On August 8, 1990, Burgos was appointed to the trust position of Special Aide, which was assigned to the Office of the SIFC Administrator.   In September 1991, Burgos was selected to occupy the career managerial position 5021 in the Class of Special Aide in the Equal Employment Opportunities Office assigned to the Human Resources Department of the SIFC. Burgos resigned from the position, effective September 7, 1993.  See ECF Nos. 193-1, ¶¶ 15–18; 206-1, ¶¶ 15–18; 216-1, tbl. A ¶¶ 17.

On June 2, 2003, Burgos returned to the SIFC in a transitory position in the Class of Administrative Officer III.  On July 1, 2004, Burgos was reclassified as a career managerial

---

[4] "HIPAA" refers to the Health Insurance Portability and Accountability Act.  See ECF Nos. 193-1, ¶ 152; 206-1, ¶ 152.

employee of the SIFC in the position 6822 of the Class of Administrative Officer III.  On April 16, 2005, Burgos began working in the managerial position of Technical Aide in an interim appointment.   Subsequently, Burgos submitted an application for a career managerial appointment for the position 3142 of the Class of Technical Aide in the Office of Corporate Compliance (HIPAA).  The position was announced by an internal job posting.  Burgos was selected to occupy the position effective July 14, 2008.  See ECF Nos. 193-1, ¶¶ 19–23, 156; 206-1, ¶¶ 19–23, 156; 216-1, tbl. A ¶ 156.

### 3.   Defendants

On January 2, 2009, Álvarez began as Administrator of the SIFC, the highest executive position in the SIFC.  The Administrator of the SIFC is in charge of executing any administrative and managerial actions to implement the Workmen's Compensation Program.   Prior to this position, Álvarez had not held any position at the SIFC.  After Álvarez became Administrator, Corcino's and Burgos's salaries and benefits were not affected or reduced prior to the annulment of their appointments.  See ECF Nos. 193-1, ¶¶ 2–3, 143–44; 206-1, ¶¶ 2–3, 143–44; 216-1, tbl. A ¶ 3.[5]

Rivera was Director of Human Resources, a trust position, from January 8, 2009, to February 23, 2012.  Rivera has uninterruptedly been an employee of the SIFC since 1978.  As Director of Human Resources, Rivera was the custodian of SIFC employee personnel records, directed the functions of the Human Resources Department, and advised the Administrator regarding the field of human resources.  See ECF Nos. 193-1, ¶¶ 4–6; 206-1, ¶¶ 4–6; 206-2, ¶ 107; 216-1, tbl. B ¶¶ 107.

---

[5] At the time of the relevant events, Álvarez was the Administrator of the SIFC.

### B.    Political Background of the Parties

#### 1.    Corcino

Throughout most of her life, Corcino has been an affiliate and activist of the Popular Democratic Party ("PDP").  She considers herself "anti-American and anti-[New Progressive Party]" ("NPP") and is a member of a group called the PDP Ladies.  ECF No. 193-48, at 33. Corcino has participated in PDP-related activities outside of working hours.  She was a member of Roberto Vigoreaux's staff during the primaries.  Corcino also worked with Mayor Héctor Luis Acevedo at the Municipality of San Juan in the Opinion Division, representing him in matters concerning the Municipal Assembly.  See ECF Nos. 193-1, ¶¶ 96–97, 112; 206-1, ¶¶ 96–97, 112; 206-2, ¶¶ 3–4, 7, 9; 216-1, tbl. A ¶ 112, tbl. B ¶¶ 3–4, 7, 9; 244, tbl. A ¶ 112, tbl. B ¶ 7.[6]

Corcino was part of the team of Luis A. Villahermosa ("Villahermosa"), who had been Human Resources Director at the time, prior to Rivera's tenure, when he represented the "Populares" at SIFC.  Corcino also "[o]ften … joined fellow populares workers" in protests against determinations made by the NPP Administration or Álvarez, arriving to work wearing black as a sign of mourning.  ECF No. 206-5, ¶ 20.[7]  Out of the 232 employees affected by Álvarez's decision, Corcino does not know the political affiliation of 158, many of whom worked in other regions.  See ECF Nos. 193-1, ¶ 114; 206-1, ¶ 114; 206-2, ¶¶ 8, 11; 216-1, tbl. A ¶ 114, tbl. B ¶¶ 8, 11; 244, tbl. A ¶ 114, tbl. B ¶¶ 8, 11.[8]

---

[6] Plaintiffs propose three facts pertaining to "the Pivazos case."  ECF No. 206-2, ¶¶ 2, 5, 24.  None of the proposed facts, however, specify a citation to the case or elaborate on what transpired during said case other than the fact that Corcino's former husband was the PDP's legal representative in the case.

[7] Plaintiffs also provide evidence that Corcino and Burgos would go to work wearing red when they had PDP activities outside of working hours.  See ECF No. 206-2, ¶¶ 10, 20.

[8] Plaintiffs submit evidence indicating that Corcino's political affiliation was "public knowledge" at the SIFC, that certain protests were "common knowledge" at the SIFC, that "everybody in the agency" knew Burgos's political affiliation, and that "many of the employees of the Corporation" knew Burgos's political affiliation.  ECF Nos. 206-3, at 2; 206-5, ¶ 21; 206-7, at 5, 8; 206-8, ¶ 13.  At the summary judgment stage, plaintiffs "must … point to specific facts" in the record "that demonstrate the existence of an authentic dispute."  McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).  "[A]n affiant's statement that certain information was 'common knowledge' [is] 'too conclusory and vague to successfully counter a motion for summary judgment.'"  Hollingsworth v. Henry Cnty.

### 2.    Burgos

Throughout most of her life, Burgos has been an affiliate and activist of the PDP.  Burgos has worked with Miguel Hernández Agosto.  Burgos has collaborated in the campaigns of Bathia and José Segui and attended the birthday activities of three governors.  The political activities which Burgos participated in took place outside working hours.  See ECF Nos. 193-1, ¶¶ 98, 113; 206-1, ¶¶ 98, 113; 206-2, ¶¶ 14, 18; 216-1, tbl. A ¶ 113, tbl. B ¶¶ 14, 18; 244, tbl. A ¶ 113, tbl. B ¶ 18.

In 2009 or afterward, Burgos participated in some protests against the NPP Administration during non-working hours at the SIFC.[9]  On one occasion, Burgos participated in a demonstration against the NPP Administration at lunch time in Metro Office Park.  Burgos also "[o]ften … joined fellow *populares* workers" in protests against determinations made by the NPP Administration or Álvarez, arriving to work wearing black as a sign of mourning.  ECF No. 206-8, ¶ 12.  Out of the 232 employees affected by Álvarez's decision, Burgos does not know the political affiliation of 163, many of whom worked in other regions.  See ECF Nos. 193-1, ¶ 116; 206-1, ¶ 116; 206-2, ¶¶ 16–17, 19, 21; 216-1, tbl. A ¶ 116, tbl. B ¶¶ 16–17, 19, 21; 244, tbl. A ¶ 116, tbl. B ¶¶ 17, 19, 21.

### 3.    Álvarez

Álvarez was offered the position of SIFC Administrator by Governor Luis Fortuño.  She had been involved in his campaign, collaborated in his health platform, personally knows him

---

Med. Ctr. EMS, Inc., No. 05-1272 B, 2007 WL 1695303, at *2 (W.D. Tenn. June 12, 2007) (quoting Stalbosky v. Belew, 205 F.3d 890, 894–95 (6th Cir. 2000)).  "Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56."  Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988).

[9] Although Burgos did not specifically indicate the time period during which she participated in protests, she testified that they occurred while she was working at Metro Office Park.  See ECF No. 206-7, at 6.  There is no indication that Burgos worked at SIFC offices in Metro Office Park before working for the Office of Corporate Compliance (HIPAA), where she began effective July 14, 2008.  Thus, it is a reasonable inference that the aforementioned protests occurred sometime after the NPP Administration began in 2009.

and his wife, and has attended fundraising and other political events.  Between August 2010 and 2011, aside from the NPP Convention, Álvarez participated in seven or eight meetings to discuss strategic plans to help the NPP.  Other SIFC employees affiliated with the NPP also attended said meetings.  Álvarez also participated in NPP activities with Edwin Padilla Díaz ("Padilla"), Director of Operations of the SIFC.  At a birthday celebration for Álvarez in 2009, there was a cake with NPP initials and "FONDO" written in frosting.  At her deposition, Álvarez was able to identify more than five SIFC personnel who surrounded her in the pictures from the party.  See ECF Nos. 193-1, ¶ 7; 206-1, ¶ 7; 206-2, ¶¶ 34–37, 39–41; 216-1, tbl. B ¶¶ 34–37, 39–41; 244, tbl. B ¶ 34.

After Álvarez became Administrator, Corcino's parking space was changed.  Nevertheless, prior to working at the SIFC, Álvarez did not know Corcino.  They have never spoken with each other.  Corcino has only seen Álvarez once, when she visited the Metro Office Park offices of the SIFC in 2009.  On that occasion, Álvarez had an "attentive look" at a poster of Eugenio María de Hostos in Corcino's office.  ECF No. 206-5, ¶ 18; see ECF Nos. 193-1, ¶¶ 99, 101; 206-1, ¶¶ 99, 101; 206-2, ¶¶ 13, 124; 216-1, tbl. A ¶¶ 99, 101, tbl. B ¶¶ 13, 124; 244, tbl. A ¶¶ 99, 101, tbl. B ¶¶ 13, 124.

On August 13, 2009, Álvarez issued a reprimand to Corcino which included "a detailed account" of an incident occurring between Corcino and Ramonita Figueroa ("Figueroa").  ECF No. 206-2, ¶ 133.  The reprimand indicates that Corcino stated to Figueroa, "[N]ow you want to save face with the NPP … after you used to sell tickets with the Populares."  ECF No. 206-23, at 2.  See ECF Nos. 206-2, ¶¶ 133–34; 216-1, tbl. B ¶¶ 133–34; 244, tbl. B ¶ 134.

Prior to working at the SIFC, Álvarez did not know Burgos.  They have not had conversations regarding politics or political ideologies.  Burgos only recalls seeing Álvarez on

one occasion, when the latter visited the Metro Office Park offices of the SIFC in 2009.  Burgos

"cannot state … categorically" that Álvarez knows her political affiliation.  ECF No. 193-57, at

46.  Álvarez has never spoken with any person regarding Burgos's political affiliation.  See ECF

Nos. 193-1, ¶¶ 102, 104–05, 107; 206-1, ¶¶ 102, 104–05, 107; 216-1, tbl. A ¶¶ 102, 104–05; 244,

tbl. A ¶¶ 102, 104.

### 4.    Other SIFC Employees[10]

Rivera is affiliated with the NPP and is known to be an NPP activist at the SIFC.  After

the elections, Rivera and his secretary shouted in the hallways, "[Y]ou're going out, now we are

here."  ECF No. 206-7, at 11.  Although it is contested whether Rivera has spoken with plaintiffs

themselves about their political affiliation, compare ECF No. 193-2, ¶¶ 51–52, with ECF Nos.

206-4, at 12; 206-7, at 9, he has never spoken with anyone else about the same.  See ECF Nos.

193-1, ¶¶ 110–11; 206-1, ¶¶ 110–11; 206-2, ¶¶ 23, 25–26, 118; 216-1, tbl. A ¶ 110, tbl. B ¶¶ 23,

25–26, 118; 244, tbl. A ¶ 110, tbl. B ¶¶ 23, 26, 118.

Padilla is an NPP affiliate who has been involved with NPP-related political activities,

such as a campaign closing, governor's messages, and buying tickets to support the NPP and its

candidates, including Governor Fortuño.  At the end of Governor Roselló's NPP administration,

Padilla was appointed in a trust position as Regional Director of the Caguas Region at the SIFC.

See ECF Nos. 206-2, ¶¶ 28–30; 216-1, tbl. B ¶¶ 28–30.

When speaking with Corcino, Padilla has made references to her PDP affiliation.  Padilla

has stated in Corcino's presence, "[W]e are the ones who say what to do now."  ECF No. 206-4,

at 5.  Padilla told Burgos and other SIFC employees that "the NPP administration was there" and

"it was the end of the easy."  ECF No. 206-7, at 9.  Although it is contested whether Padilla has

---

[10] Plaintiffs' political discrimination claims were dismissed with respect to Rivera, Padilla, and Pérez.  See ECF No. 31.  Thus, allegations of political discrimination pertaining to these SIFC employees are relevant only to the extent that they may be imputed to defendant SIFC.

spoken with plaintiffs themselves about their political affiliation, compare ECF No. 193-1, ¶¶ 108–09, with id. ¶ 121, he has never spoken with anyone else about the same.  During a meeting, Fernando Pérez Carpio ("Pérez"), Sub-Director of Operations, stated in Burgos's presence that the NPP Administration was "there now, and they were the ones who said what to do."  Id. at 12; see ECF Nos. 193-1, ¶¶ 108–09; 206-1, ¶¶ 108–09; 206-2, ¶¶ 117, 119, 121–22; 216-1, tbl. A ¶¶ 108–09, tbl. B ¶¶ 117, 119, 121–22; 244, tbl. A ¶¶ 108–09, tbl. B ¶¶ 117, 119, 121–22.

### C.      The Office of Corporate Compliance (HIPAA)

#### 1.      Previous Administrations

In an effort to bring the SIFC into compliance with HIPAA, Nicolas López Peña ("López"), Administrator of the SIFC during Governor Sila Calderón's administration, issued Administrative Order No. 14.   The order created the position of the Privacy, Security and Compliance Officer.   On October 28, 2003, López's assistant requested the appointment of a person to fill the position from Dr. Sheila Rivera ("Dr. Rivera"), the Associated Medical Director of Medical Services.   On October 31, 2003, Olga Grajales Meléndez ("Grajales"), Director of the Administrative Area, requested that Dr. Rivera seek authorization from the Budget Office to request the provisional authorization for the disbursement of funds for the hiring of provisional managerial personnel.   The same day, Dr. Rivera sent a memorandum to Grajales in compliance with Administrative Order No. 14.   See ECF Nos. 206-2, ¶¶ 42, 44–47; 216-1, tbl. B ¶¶ 42, 44–47; 244, tbl. B ¶¶ 45–47.[11]

On or around January 21, 2004, Dr. Rivera submitted an official application for a job opening for the position of Privacy, Security and Compliance Officer, which was assigned the

---

[11] Defendants contend that several documents were not produced in discovery by plaintiffs.  See ECF No. 216-1, tbl. A ¶¶ 52, 62, 100, 162, tbl. B ¶¶ 45–47, 58, 112–13.  Defendants also contend that certain documents constitute inadmissible hearsay.  See ECF No. 216-1, tbl. B ¶¶ 45–48, 50.  It is unnecessary, however, to address the merits of these discovery and evidentiary disputes, as summary judgment is warranted for defendants even when considering said documents.

number 6758.  On or around February 4, 2004, Villahermosa, who was Assistant Director of Human Resources at the time, sent to Lydia Correa ("Correa"), Budget Director, a form with signatures of approval, requesting temporary appointment of a person to fill position 6758. Corcino was selected for the position, effective June 16, 2004.  The position had career status and was attached to the Medical Services Division.  Corcino was in charge of implementing the rules and regulations regarding HIPAA compliance and corresponding training given to employees.  See ECF Nos. 193-1, ¶ 12; 206-1, ¶ 12; 206-2, ¶¶ 48–49, 54; 216-1, tbl. B ¶¶ 48–49, 54; 244, tbl. B ¶¶ 48, 54.

> On August 13, 2004, López's assistant sent a memorandum to Villahermosa, stating:
>
>> I request all the management job openings that are currently pending to be issued in a period of five working days be prepared. These job openings are being issued internally in order to avoid affecting the related budget items.
>>
>> Therefore, only active Corporation employees can apply. This action is being taken in order to cover the needs that have been identified promptly.

ECF No. 217-3, at 14; see ECF Nos. 206-2, ¶ 50; 216-1, tbl. B ¶ 50; 244, tbl. B ¶ 50.

On May 1, 2005, Corcino was appointed to the trust position of Special Aide II, responding directly to Salvador Rovira Rodríguez ("Rovira"), Administrator of the SIFC, and the Board of Directors.  On June 9, 2005, the Board of Directors unanimously approved Resolution No. 2005-14, which established the public policy of privacy, security, and confidentiality and created the Office of Corporate Compliance (HIPAA) ("the OCC") in order to implement HIPAA.  On June 13, 2005, Rovira submitted Administrative Order No. 05-03 to the Board of Directors for approval, the issuance of which created the position of Compliance, Privacy and Safety Officer.  The order was notified to all SIFC employees.  See ECF Nos. 193-1, ¶ 24; 206-1, ¶ 24; 206-2, ¶¶ 52, 55–57, 66–67; 216-1, tbl. B ¶¶ 52, 55–57, 66–67; 244, tbl. B ¶¶ 56, 66–67.

10

On August 5, 2005, Corcino requested from Dr. Iris Otero the transfer of the positions of Privacy, Security and Compliance Officer and Technical Aide, held by Burgos, from the Medical Services Division to the newly-created OCC.   The OCC was composed of a Director of Corporate Compliance, an Officer of Compliance, a Technical Aide, eleven compliance coordinators, and one secretary.   The office reported directly to the Administrator.   Initially, it was placed in the SIFC Central Offices.   Less than two years after its creation, the OCC was temporarily transferred to the San Juan Regional Offices.   Before January 2009, the office was transferred to the SIFC offices in Metro Office Park in Guaynabo, Puerto Rico.   See ECF Nos. 193-1, ¶¶ 25–26; 206-1, ¶¶ 25–26; 206-2, ¶¶ 58–60; 216-1, tbl. A ¶ 26, tbl. B ¶¶ 58–60; 244, tbl. A ¶ 26.

### 2.      NPP Administration

When she began at the SIFC, Álvarez had not become familiarized with the OCC's organizational chart.   Between January and April 2009, Álvarez was unaware that the OCC and its Director reported directly to her.   She was also unfamiliar with the objective of the OCC, how it was created, and its specific functions regarding investigation of patients' complaints and fraud irregularities.   Álvarez did not become familiarized with Resolution No. 2005-14 during her first year at the SIFC.   She had never seen the job descriptions of the Officer of Corporate Compliance or the Director of the OCC before December 13, 2011.  See ECF Nos. 206-2, ¶¶ 68–70, 72; 216-1, tbl. B ¶¶ 68–70, 72; 244, tbl. B ¶¶ 68–70, 72.

On February 9, 2009, Corcino sent a letter to Álvarez requesting the appointment of members to the Corporate Compliance Committee, but did not receive a response.   On the same day, Álvarez sent a memorandum to Padilla and Corcino, indicating that she had decided to delegate the supervision of the OCC to the Operations Area and Padilla, its Director.   The memorandum states, "Because said office is located in the facilities of Metro Office Park, and

inasmuch as its functions are in keeping with the responsibility delegated on the Operations Area, we are giving out instructions for said office to respond directly to the Operations Area, which is provisionally directed by Mr. Edwin Padilla."  ECF No. 193-36.  However, other offices located in Metro Office Park, such as Corporate Security and Health and Security, were not assigned to the Operations Area.  See ECF Nos. 193-1, ¶ 27; 206-1, ¶ 27; 206-2, ¶¶ 64, 71, 75–76; 216-1, tbl. B ¶¶ 64, 71, 75–76; 244, tbl. B ¶¶ 64, 71, 75–76.

On February 23, 2009, Padilla met with Corcino to inform her about the change.  During the meeting, Corcino explained the duties and responsibilities of the OCC and the importance of patients' rights under HIPAA.  Corcino argued that Álvarez's order was "illegal" and "*ultra vires*," and presented a conflict of interest because the OCC also investigated the Operations Area.  ECF No. 206-5, ¶ 7.  Corcino also expressed that it would be better if the OCC responded to the Medical Area instead of the Operations Area.  Padilla responded that such a change would not be an option, because the instructions came from Álvarez.  Padilla also stated that the OCC was under his supervision now that "they had won."  Id. ¶¶ 9–10; see ECF Nos. 193-1, ¶ 28; 206-1, ¶ 28; 206-2, ¶¶ 77–81, 85; 216-1, tbl. A ¶ 28, tbl. B ¶¶ 77–81, 85; 244, tbl. A ¶ 28, tbl. B ¶¶ 77–81, 85.

A short time after the supervision of the OCC was assigned to the Operations Area, the offices of the OCC were moved to different offices, near Padilla, within the same building at the SIFC.  Although other offices had been available, the previous offices were assigned to new personnel assigned to the SIFC Administrator, who were affiliated with the NPP.  Neither Padilla nor Álvarez directly made the decision to change the offices, although Padilla was informed of the same in a letter from Corcino.  See ECF No. 193-37, at 2.  Corcino was unaware of the reasons behind the decision.  The office of Burgos's secretary, Anamar Vázquez Rivera

("Vázquez"), was moved to a different hallway from Burgos.  An office near Burgos was given to Padilla's secretary.  Subsequently, Vázquez was transferred from the OCC to another division. The office area assigned to the OCC did not have a door to protect storage of complaint files. See ECF Nos. 193-1, ¶¶ 131–33; 206-1, ¶¶ 131–33; 206-2, ¶¶ 126–30; 216-1, tbl. A ¶¶ 131–33, tbl. B ¶¶ 126–30; 244, tbl. A ¶¶ 131–32, tbl. B ¶¶ 126–30.

After being appointed Director, Padilla evaluated the functions and status of all of the bureaus and offices under his supervision.  After this evaluation, Padilla reassigned the supervision of the attendance of the OCC's employees to Pérez.  Attendance of employees in other offices, however, was conducted by their respective Directors.  The offices and bureaus under Padilla's supervision and their respective functions were reorganized in March 2009. After making such changes, each office was to begin functioning again.  See ECF Nos. 193-1, ¶¶ 29, 127; 206-1, ¶¶ 29, 127; 206-2, ¶¶ 82–83; 216-1, tbl. A ¶ 29, tbl. B ¶¶ 82–83; 244, tbl. A ¶ 29, tbl. B ¶¶ 82–83.

As part of the reorganization, the OCC's training sessions were suspended while the evaluations of the entire office were finalized.  Padilla, however, did not inform Corcino of the reasons for the suspension of the trainings.  Corcino sent a letter to Álvarez dated February 23, 2009, stating, "On February 11, 2009 we received your letter indicating that you delegated the supervision of the Corporate Compliance Area on Mr. Edwin Padilla Díaz, Acting Director in the Trust Service of the Operations Area."  ECF No. 193-25, at 1.  In the letter, Corcino requested that Álvarez reconsider her decision of transferring the supervision of the OCC to the Operations Area.  Corcino also sent a letter to Padilla dated March 11, 2009, stating, "On February 23, 2009 we held a meeting in which I was informed that the Corporate Compliance Area would be supervised by the Operations Area, as delegated by the administrator, Atty. Zoimé Alvarez

Rubio in a memorandum received on February 11, 2009." ECF No. 193-37, at 1.  In the letter, Corcino requested that the training sessions be restarted.  See ECF Nos. 193-1, ¶¶ 29–30, 119, 134–35; 206-1, ¶¶ 29–30, 119, 134–35; 206-2, ¶¶ 84, 86; 216-1, tbl. A ¶¶ 29–30, tbl. B ¶¶ 84, 86; 244, tbl. A ¶¶ 29–30, tbl. B ¶¶ 84, 86.

The supervision of the OCC employees was done by Padilla and Pérez, who were assigned by Álvarez.  Since Padilla began supervising the OCC in February 2009, he watched Corcino and Burgos, questioning the functions of the office.  When he took over supervision of the OCC, Padilla told Vázquez, Burgos's secretary, that "it was over."  ECF No. 206-3, at 6. Pérez "spent about every ten, fifteen minutes watching."  ECF No. 206-4, at 22.  Corcino did not receive responses to the letters which she sent to Álvarez.  See ECF Nos. 193-1, ¶¶ 120, 130; 206-1, ¶¶ 120, 130; 206-2, ¶¶ 84, 115, 132; 216-1, tbl. A ¶¶ 120, 130, tbl. B ¶¶ 84, 115, 132; 244, tbl. A ¶¶ 120, 130, tbl. B ¶¶ 84, 115, 132.

On March 16 and 20, 2009, Corcino sent letters to Padilla, submitting attendance reports of the OCC employees.  In these letters, she did not object to the removal of supervisory duties relating to attendance or any other function.  Corcino did not receive responses to these letters. Besides these two letters, Corcino did not send any other letter regarding her supervisory duties. See ECF Nos. 193-1, ¶¶ 128–29; 206-1, ¶¶ 128–29; 216-1, tbl. A ¶¶ 128–29; 244, tbl. A ¶¶ 128–29.

After Padilla encountered a situation concerning the complaint record of a patient in Ponce where he did not know how to proceed, he agreed to a meeting with Corcino.  During the meeting, held on March 18, 2009, Corcino explained to Padilla that she was concerned that the patient complaint was mishandled, that his privacy was exposed to third parties, and that the suspension of the training and investigations of patient complaints might implicate HIPAA.

Corcino asked Padilla to reconsider his decision to suspend the trainings and investigations.  He

asked her for a new schedule for training sessions, which Corcino provided on March 25, 2009.

On April 17, 2009, the OCC training sessions were reinstated.  While under the Operations

Area's supervision, Corcino and Burgos participated as resources in eleven training sessions and,

respectively, twelve and six meetings.  See ECF Nos. 193-1, ¶¶ 31–36, 136–41; 206-1, ¶¶ 31–36,

136–41; 206-2, ¶¶ 87–90; 216-1, tbl. A ¶¶ 31, 136, 138–41, tbl. B ¶¶ 87–90; 244, tbl. A ¶¶ 31,

136, tbl. B ¶¶ 87–89.

The supervision of the OCC was changed to the Medical Area in November 2009.  The

OCC subsequently changed its name to Office of Compliance of HIPPA Law.  After Corcino left

the SIFC, no one has been in charge of supervising the implementation of Resolution No. 2005-

14.  See ECF Nos. 193-1, ¶ 37; 206-1, ¶ 37; 206-2, ¶¶ 62, 91; 216-1, tbl. A ¶ 37, tbl. B ¶¶ 62, 91;

244, tbl. B ¶ 91.

### D.    Internal Job Postings

After speaking with Villahermosa, on June 26, 2003, Grajales sent a memorandum to

Administrator López requesting authorization for the use of internal job postings to recruit

managerial employees in the SIFC.  According to Grajales, "[o]ne of the reasons that led to

justifying internal job [notices] … was the concerns brought by employees … who were not

being selected through the open job notices[,] [e]ven though the Fund was paying for their

studies and they had the education."  ECF No. 193-72, at 11.  Other reasons included the

professional development of the SIFC's employees, the required knowledge, preparation, and the

location of the positions.  After quoting Article 14, Section 14.1, of the Personnel Regulations,

the memorandum states, "In accordance to this provision, we have determined that certain

positions for reason of their placement, it is desirable to recruit personnel with competency

and/or knowledge of the processes of the specific area."  ECF No. 206-20, at 1; see ECF Nos.

193-1, ¶¶ 78–81; 206-1, ¶¶ 78–81; 206-2, ¶¶ 101, 139; 216-1, tbl. A ¶¶ 78–79, tbl. B ¶¶ 101, 139; 244, tbl. A ¶¶ 78–79, tbl. B ¶ 139.

The memorandum includes a list of such managerial positions that were going to be filled through internal job postings.  Grajales signed the memorandum and put her initials on all of the pages of the list so that no other position would be added to the list.  The list does not include all of the positions included in the affected classes of positions.  See ECF Nos. 193-1, ¶¶ 81–83; 206-1, ¶¶ 81–83; 206-2, ¶ 140; 216-1, tbl. A ¶¶ 82–83, tbl. B ¶ 140; 244, tbl. A ¶¶ 82–83.

Other than the aforementioned memorandum, Grajales does not recall preparing any document recommending the issuance of internal announcements.  Carlos Ruiz Nazario ("Ruiz"), who was Associate Director between 2005 and 2006 and Administrator between 2006 and 2008, does not recall authorizing internal job postings for an entire class of positions, only for individual positions.  See ECF Nos. 193-1, ¶¶ 74, 85–86; 206-1, ¶¶ 74, 85–86; 216-1, tbl. A ¶¶ 85–86; 244, tbl. A ¶¶ 85–86.

There are no documents authorizing the issuance of internal job postings for the position 6758 in the Class of Compliance, Security and Privacy Officer (HIPAA) or the position 3142 of the Class of Technical Aide in the OCC.  The document authorizing the opening of position 6758 in the Class of Compliance, Security and Privacy Officer (HIPAA)—Corcino's position—states in the section titled "Recommendations," "Cover the position according to the established proceedings."  ECF No. 193-13.  The document authorizing the opening of position 3142 of the Class of Technical Aide in the CCO—Burgos's position—states in the section titled "Recommendations," "Circulate and cover following the proceedings in effect, subject to the revision of the position under the Classification Plan for Management Employees."  ECF No.

193-14.  Neither of the documents provides that the respective job posting could be internal.  <u>See</u> ECF Nos. 193-1, ¶¶ 88–90; 206-1, ¶¶ 88–90; 216-1, tbl. A ¶¶ 88–90; 244, tbl. A ¶¶ 89–90.

The minimum requirements to compete for either Corcino's or Burgos's nullified position did not include being an employee of or having experience in the SIFC.  There are people outside of the SIFC who meet the minimum requirements for the positions which Corcino and Burgos occupied.  Both Corcino and Burgos were selected for their respective positions because of their capabilities, not their political beliefs.  When she was selected for her position, no one asked Corcino what her political affiliation was.  <u>See</u> ECF Nos. 193-1, ¶¶ 152–54, 157–59, 161; 206-1, ¶¶ 152–54, 157–59, 161; 216-1, tbl. A ¶¶ 153, 158; 244, tbl. A ¶¶ 153, 158.

While Ruiz was Associate Director between 2005 and 2006, it was "sometimes … very difficult" to consider candidates from outside the SIFC, because Correa maintained that, "as a general rule," job notices should be internal.  ECF No. 193-71, at 14.  In determining whether a job posting should be internal or open, Ruiz considered experience with internal processes, reductions in costs, knowledge, and "trajectory."  ECF No. 206-15, at 5–7.  Ruiz approved internal job postings on the basis of documents generated by the Human Resources Department and Financial Office, which included recommendations with respect to those jobs, such as ones prepared and signed by Correa.  <u>See</u> ECF Nos. 193-1, ¶¶ 94–95; 206-1, ¶¶ 94–95; 206-2, ¶¶ 136–38; 216-1, tbl. A ¶¶ 94–95, tbl. B ¶¶ 136–38; 244, tbl. A ¶¶ 94–95, tbl. B ¶ 137.

### E.   Audit

Álvarez ordered a review of all of the SIFC's personnel transactions carried out between January 1, 2001, and December 31, 2008.  This period of time encompassed the two previous PDP terms.  The purpose was to ensure the compliance of regulations and procedures governing the Human Resources Department, particularly with respect to the merit principle.  <u>See</u> ECF Nos. 193-1, ¶ 38; 206-1, ¶ 38; 206-2, ¶ 92; 216-1, tbl. A ¶ 38, tbl. B ¶ 92; 244, tbl. A ¶ 38.

Álvarez delegated the investigation to Rivera.  Three of the Administrator's executive assistants were involved in the audit process.  The resulting Audit Report was drafted with the advice of attorney Roberto Feijoo.  See ECF Nos. 193-1, ¶ 39; 206-1, ¶ 39; 206-2, ¶¶ 92, 95–96; 216-1, tbl. B ¶¶ 92, 95–96; 244, tbl. B ¶ 96.

The decision to perform an audit on the personnel transactions for the period of 2001 to 2008 was taken because the previous evaluation was performed at the beginning of 2001.  In 2001, the new administration, at the beginning of its tenure, analyzed and evaluated the personnel transactions and contracts made by the prior administrations.  Grajales and Villahermosa personally participated in the investigation and analysis.  Over 200 personnel transactions were declared null and void.  See ECF Nos. 193-1, ¶¶ 148–50; 206-1, ¶¶ 148–50; 216-1, tbl. A ¶¶ 148, 150; 244, tbl. A ¶¶ 148, 150.

When conducting the 2009 audit, Rivera did not identify "what kind of investigation was done before."  ECF No. 217-2, at 6.  Rivera had not participated in the previous audit or investigation.  There was no audit protocol or procedure for the Human Resources Department to follow.  Although Rivera looked at Corcino's and Burgos's personnel files and work trajectories, he did not conduct an "independent analysis" of their cases when conducting the audit.  ECF No. 206-10, at 3–4.  There was no reference to HIPAA procedures or Law 172 in the Audit Report. See ECF Nos. 206-2, ¶¶ 93–94, 98, 103–05; 216-1, tbl. B ¶¶ 93–94, 98, 103–05; 244, tbl. B ¶¶ 93, 98, 105.

The personnel files of all 3,835 SIFC employees were examined.  On October 28, 2009, Rivera and the Human Resources Department tendered an Audit Report.  The Audit Report concluded that 232 personnel files—including plaintiffs'—included appointments made through internal job postings, rather than open competition, between January 1, 2001, and December 31,

2008, in violation of Article 14, Section 14.1, of the Personnel Regulations. See ECF Nos. 193-1, ¶¶ 40–42, 50; 206-1, ¶¶ 40–42, 50; 216-1, tbl. A ¶¶ 40–42, 50; 244, tbl. A ¶¶ 40–42, 50.

After reviewing the Audit Report and obtaining legal consultation, Álvarez approved its recommendations and ordered that the personnel transactions allegedly done in violation of the Personnel Regulations be annulled. Without exception, all of the SIFC personnel transactions in which career managerial employees were appointed through internal job postings from 2003 to 2009 were declared null and void as a result of Álvarez's decision. Among the 232 personnel transactions which were annulled was Rivera's appointment to the career position of Officer of Personnel Affairs II in the Payroll Office, which he held between May 16 and December 31, 2008. After the nullification of his career position, Rivera continued as the Director of Human Resources. From May 2008 until 2009, Rivera did not question the validity of his internal job posting. Aside from conducting the audit, Rivera was not involved with the decision to nullify the appointments made by internal job postings, including plaintiffs' appointments. Padilla and Pérez also were not involved in said decision. See ECF Nos. 193-1, ¶¶ 43–45, 53, 56; 206-1, ¶¶ 43–45, 53, 56; 206-2, ¶¶ 108–09; 216-1, tbl. A ¶¶ 43–45, 53, 56, tbl. B ¶¶ 108–09; 244, tbl. A ¶¶ 43–45, tbl. B ¶ 108.

Since January 1, 2009, the mechanism of internal job postings for recruiting career managerial employees has not been used at the SIFC. At least six affected employees subsequently were selected to or ascended to occupy unionized positions at the SIFC. At least twelve affected employees subsequently participated in open job postings and were selected to occupy career managerial positions at the SIFC. Among the employees whose appointments were declared null and void by Álvarez as a result of the audit include sixteen employees affiliated with the NPP and nine employees not affiliated with either the PDP or the NPP. See

ECF Nos. 193-1, ¶¶ 52, 54–55, 57–59; 206-1, ¶¶ 52, 54–55, 57–59; 216-1, tbl. A ¶¶ 52, 54–55, 57–59; 244, tbl. A ¶¶ 52, 54–55, 57–59.

### F.     Nullification of Appointments

The Human Resources Department commenced procedures to notify all of the affected employees by the Administrator's determinations.  As part of said process, letters of intent were periodically notified.  Through the letters of intent, the affected employees were notified of the analysis that had been conducted, the result of said analysis and the intention of the Administrator to nullify the appointments that had been done in violation of the applicable laws and regulations.  The letters also informed the employees of their right to request an administrative informal hearing in order to contest the Administrator's determination.  See ECF Nos. 193-1, ¶ 60; 206-1, ¶ 60.

On January 8, 2010, Corcino received a letter indicating an "intention to declare legally null and void [her] appointment."  ECF Nos. 193-5.  The letter states that Corcino was not entitled to reinstatement and would be separated from career service.  The letter also advised Corcino of her right to request an informal administrative hearing before an Official Examiner.  On January 21, 2010, Corcino requested a copy of the Audit Report, but was not provided with it.  See ECF Nos. 193-1, ¶ 61; 206-1, ¶ 61; 206-2, ¶¶ 111, 141, 144; 216-1, tbl. B ¶¶ 111, 141, 144; 244, tbl. B ¶ 144.

On March 6, 2010, Corcino filed a petition of interlocutory review to the SIFC Board of Appeals, raising allegations of political discrimination.  Corcino also requested an informal administrative hearing, which was held on April 7, 2010.  During the hearing, Corcino was afforded the opportunity to present her position and was represented by her attorneys.  Corcino did not receive access to her personnel file until one day after the hearing.  See ECF Nos. 193-1,

¶ 62; 206-1, ¶ 62; 206-2, ¶¶ 112–13, 142; 216-1, tbl. A ¶ 62, tbl. B ¶¶ 112–13, 142; 244, tbl. A ¶ 62, tbl. B ¶¶ 112–13.

On April 27, 2010, the Official Examiner who presided over Corcino's hearing issued a report relating to the Administrator's intent to nullify her appointment.  The report indicates that Corcino's appointment to position 6758 of the Class of Compliance, Security and Privacy Officer (HIPAA) by internal job posting was contrary to the merit principle.  The Official Examiner recommended the nullification of Corcino's appointment.  See ECF Nos. 193-1, ¶ 63; 206-1, ¶ 63; 216-1, tbl. A ¶ 63; 244, tbl. A ¶ 63.

On May 11, 2010, after reviewing the Official Examiner's report, Álvarez sent a letter to Corcino, dated April 29, 2010.  The letter indicates that Álvarez adopted the Official Examiner's report and "declare[d] null and void" Corcino's appointment, separating her from career service.  ECF No. 193-10.  The letter also advised Corcino of her right to appeal the decision of the Administrator before the SIFC Board of Appeals.  Corcino did not appeal the decision before the SIFC Board of Appeals.  Before its production in discovery in the instant case, Corcino had not seen the Official Examiner's report.  See ECF Nos. 193-1, ¶ 67; 206-1, ¶ 67; 206-2, ¶ 145; 216-1, tbl. A ¶ 67, tbl. B ¶ 145; 244, tbl. A ¶ 67, tbl. B ¶ 145.

On January 8, 2010, Burgos received a letter indicating an "intention to declare legally null and void [her] promotion."  ECF No. 193-7.  The letter states that Burgos was entitled to reinstatement to position 6822 of the Class of Administrative Officer III.  The letter also advised Burgos of her right to request an informal administrative hearing before an Official Examiner.  Burgos requested an informal administrative hearing.  Burgos also requested a copy of the Audit Report, "among others [sic] documents."  ECF No. 206-8, ¶ 8; see ECF Nos. 193-1, ¶¶ 64–65;

206-1, ¶¶ 64–65; 206-2, ¶¶ 111, 147; 216-1, tbl. A ¶ 65, tbl. B ¶¶ 111, 147; 244, tbl. A ¶ 65, tbl. B ¶ 147.

On July 16, 2010, an Official Examiner issued a report relating to the Administrator's intent to nullify her appointment.  The report indicates that Burgos's appointment to position 3142 of the Class of Technical Aide in the OCC by internal job posting was contrary to the merit principle.  The Official Examiner recommended the nullification of Burgos's appointment and reinstatement to position 6822 of the Class of Administrative Officer III.  See ECF Nos. 193-1, ¶ 66; 206-1, ¶ 66; 216-1, tbl. A ¶ 66; 244, tbl. A ¶ 66.

On September 16, 2010, after reviewing the Official Examiner's report, Álvarez sent a letter to Burgos, dated September 9, 2010.  The letter indicates that Álvarez adopted the Official Examiner's report and "declare[d] null and void" Burgos's promotion, reinstating her to position 6822 of the Class of Administrative Officer III.  ECF No. 193-11.  The letter also advised Burgos of her right to appeal the decision of the Administrator before the SIFC Board of Appeals.  At some point, Burgos requested the Official Examiner's report.  Nevertheless, she did not see the report before its production in discovery.  On October 14, 2010, Burgos filed an appeal before the SIFC Board of Appeals.  See ECF Nos. 193-1, ¶¶ 68–69; 206-1, ¶¶ 68–69; 206-2, ¶¶ 150–51; 216-1, tbl. B ¶¶ 150–51; 244, tbl. B ¶¶ 150–51.

## III.   LEGAL STANDARD

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).  Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving

party.  A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'"  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug., Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute."  McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).  The plaintiff need not, however, "rely on *uncontradicted* evidence ….  So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan, 904 F.2d at 115 (citations omitted).  There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood …."  Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st

Cir. 1987).   The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation."   Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## IV.   ANALYSIS

### A.     Due Process Claims

On April 1, 2013, the court ordered plaintiffs to show cause as to why, in light of the Puerto Rico Supreme Court's decision in González-Segarra, their due process claims should not be dismissed.   ECF No. 175.   On May 28, 2013, plaintiffs filed a motion in compliance.   ECF No. 199.   In the motion, plaintiffs in effect reiterate that they did not receive a meaningful opportunity to be heard prior to the nullification of their appointments.   See id. ¶¶ 15–19, 21. They point out that the Puerto Rico Supreme Court decision did not address the issue of whether Corcino and Burgos received adequate notice.   See id. ¶¶ 14, 20.   Similarly, in their proffered reply to defendants' response in opposition, plaintiffs cite several "distinguishing facts."   ECF No. 218-1, ¶ 10.   Each of the facts addresses whether adequate process was given to Corcino and Burgos before the nullification of their appointments.   Nevertheless, this sidesteps the prior question of whether plaintiffs were entitled to any process at all.

The guarantee of procedural due process in the U.S. Constitution protects persons from deprivations of property by the state without due process of law.[12]   Nonetheless, "property interests are not defined by the Constitution."   Lowe v. Scott, 959 F.2d 323, 334 (1st Cir. 1992). "'Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ….'"   Id. (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).   As such, "[i]n order for plaintiffs to have

---

[12] In this case, plaintiffs have alleged deprivations of procedural rather than substantive due process, as they claim that defendants deprived plaintiffs of their "property rights without due process of law."  ECF No. 1, ¶ 1; see also id. ¶¶ 94–103.

procedural due process rights in their employment, each plaintiff must have had a reasonable expectation, based on a statute, policy, rule, or contract, that he or she would continue to be employed." Concepción Chaparro v. Ruiz-Hernández, 607 F.3d 261, 264 (1st Cir. 2010). "Under Puerto Rico law, … [a]s a general rule, those who lawfully hold ['career'] positions have a protected property interest in continued employment in those positions." Costa-Urena v. Segarra, 590 F.3d 18, 27 (1st Cir. 2009). In contrast, "[e]mployees whose hiring contravened Commonwealth laws and regulations … are not vested with a property interest in their career positions." Casiano-Montañez v. State Ins. Fund Corp., 707 F.3d 124, 129 (1st Cir. 2013). Rather, the career appointments of such employees "'are null and void *ab initio*' and no due process protections attach." Id. (quoting Kauffman v. Puerto Rico Tel. Co., 841 F.2d 1169, 1173, 1176 (1st Cir. 1988) (holding that it was not erroneous to grant summary judgment on a due process claim where "plaintiffs were clearly recruited and hired in violation of the law")); see also Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 27 (1st Cir. 2006) (affirming summary judgment "without evaluating the adequacy of [plaintiffs'] pre-termination hearings" because their "positions were secured in violation of [the entity's] Personnel Regulations").

Although plaintiffs are correct that the Puerto Rico Supreme Court's decision does not discuss the extent of process afforded to the González-Segarra plaintiffs, it does address the issue of whether appointments made under factually similar circumstances were valid under Puerto Rico law. González-Segarra involved twenty-three plaintiffs whose appointments, like those of the instant plaintiffs, were nullified as a result of the audit ordered by Álvarez. The González-Segarra court concluded that the plaintiffs' appointments were not in conformity with the requirements of Section 14.1 of the SIFC Personnel Regulations and were contrary to the merit principle.

The González-Segarra court began its legal analysis by pointing out that the Personnel Regulations "caution[] that the recruiting … must respect the principle of merit and allow the participation of external aspirants who are qualified."  2013 WL 1395853, at *19.  "It is not limited to announcing only to employees of the SIFC."  Id.  In particular, Section 14.1 of the Personnel Regulations "begins with the affirmation that to strengthen the principle of merit, *the positions will be filled through open competition*."  Id. (internal quotation omitted) (emphasis in original).

In their response in opposition to the motion for summary judgment, plaintiffs correctly emphasize that "that there is no absolute prohibition on the use of internal job postings."  ECF No. 206, at 31 (citing Laboy v. E.L.A., 15 P.R. Offic. Trans. 257 (1984)).  The González-Segarra court stated that the proposition that, "in recruiting, selection, or promotion processes, the agencies are not always obligated to publish *open competition* job announcements to comply with the principle of merit incorporated in these laws … is correct."  2013 WL 1395853, at *21 (emphasis in original) (internal quotation omitted).  Similarly, "the appointing authority has discretion to limit the competition in some instances."  Id. at *19.

Such discretion, however, "is not absolute."  Id. (internal quotation omitted).  The Puerto Rico Supreme Court identifies two criteria which must be met in order for an internal job posting to be warranted under the SIFC Personnel Regulations.  First, "Sec. 14.1 of the Personnel Regulations … did not authorize identifying an isolated position to limit competition, rather an entire 'class of positions.'"  Id.  Second, it is "necessary, before limiting the competition, to have a prior study done that specifies the nature of the position and the experience needed to hold the same."  Id. at *20.  In other words, for a position to be announced internally, its entire class of positions must be conducted by internal job postings and an "analysis" must be conducted "on

the need for those positions to be announced internally due to the particularities of the work to be done." Id.

With respect to the first requirement, plaintiffs must point to evidence which is "both cognizable and sufficiently strong" to support a finding that the entire classes which included plaintiffs' positions were identified for internal job postings. Calero–Cerezo, 355 F.3d at 19. No evidence, however, has been presented to the court that all of the positions in the classes which included plaintiffs' positions were subject to internal job postings. Plaintiffs identify a memorandum authored by Grajales, Director of the Administrative Area, on June 26, 2003. See ECF No. 206-20. However, it is uncontested that the list of positions attached to the memorandum did not include each position encompassed by the affected classes of positions. Moreover, Grajales does not recall preparing any other document recommending issuing internal job postings. Ruiz, who served as Associate Director and Administrator between 2005 and 2008, only recalls authorizing internal job postings for individual positions, as opposed to entire classes of positions. See ECF Nos. 193-1, ¶¶ 83, 85–86; 206-1, ¶¶ 83, 85–86; 216-1, tbl. A ¶¶ 83, 85–86; 244, tbl. A ¶¶ 83, 85–86. Because the Personnel Regulations do not authorize limiting competition for "an isolated position," as opposed to "an entire 'class of positions,'" González-Segarra, 2013 WL 1395853, at *19, "no due process protections attach" to Corcino's and Burgos's career appointments. Casiano-Montañez, 707 F.3d at 129.

Moreover, plaintiffs' appointments did not comply with the second requirement either. Plaintiffs "must affirmatively point to specific facts" in the record, McCarthy, 56 F.3d at 315, which could lead a reasonable jury to conclude that there was an "analysis on the need for [plaintiffs'] positions to be announced internally due to the particularities of the work to be done." González-Segarra, 2013 WL 1395853, at *20. Plaintiffs submit as evidence Grajales's

memorandum, dated June 26, 2003.  See ECF No. 206-20.  As an initial matter, neither of plaintiffs' positions appears on the list of positions attached to the memorandum.  See id. at 2–4. Similarly, in González-Segarra, the positions of all of the plaintiffs, save one, were not listed in the memorandum.  2013 WL 1395853, at *2.  The court stated that, with respect to those plaintiffs, "there is no other justification in the file for the recruiting … through internal job announcements" and that there was an "absence of reasons to limit competition in a job announcement."  Id. at *2, *20.

Even if one were to assume that the memorandum applies in the case of the instant plaintiffs, as it did for one of the plaintiffs in González-Segarra whose position was specifically listed, the memorandum would not be sufficient for a reasonable jury to conclude that an analysis was conducted with respect to Corcino's and Burgos's positions.  Grajales's memorandum states that, with respect to "certain positions," it was determined that, "for reason of their placement, it is desirable to recruit personnel with competency and/or knowledge of the processes of the specific area."  ECF No. 206-20, at 1.  In other words, "the reason for limiting" the "competition of the job announcement[s]" set forth in Grajales's memorandum "was the location of the position[s]."  González-Segarra, 2013 WL 1395853, at *20.  Nevertheless, "[t]here was no indication as to why that foundation allows limiting the open competition to that position according to Sec. 14.1 of the Regulation and invoking an exception to an important practice that safeguards the principle of merit in the recruiting of employees."  Id.  Thus, merely asserting that the location of a position justifies internal job postings does not constitute "a prior study … that specifies the nature of the position and the experience needed to hold the same."  Id.

Testimony from Grajales and Ruiz about the reasons that had been used in general to consider whether a job posting should be internal or external encounters the same obstacles.  See

ECF Nos. 193-1, ¶¶ 79–80; 206-1, ¶¶ 79–80; 206-2, ¶¶ 137–39; 216-1, tbl. A ¶ 79, tbl. B ¶¶ 137–39; 244, tbl. A ¶ 79, tbl. B ¶¶ 137, 139.   First, the evidence submitted to the court does not specifically identify that the cited criteria were applied to the job postings for Corcino's and Burgos's positions.   Second, even if it did, evidence must be presented to the court as to why those criteria permit the invocation of an exception to the merit principle.   See González-Segarra, 2013 WL 1395853, at *20.   As for the sole plaintiff in González-Segarra whose position was listed in Grajales's memorandum, a mere list of the factors that were allegedly considered when deciding that the job postings for Corcino's and Burgos's positions would be internal is not sufficient for a reasonable jury to determine that an analysis was conducted "on the need for [plaintiffs'] positions to be announced internally due to the particularities of the work to be done."   Id.

It is uncontested that there no documents specifically authorizing the issuance of internal job postings for Corcino's and Burgos's positions.   See ECF Nos. 193-1, ¶ 88; 206-1, ¶ 88; 216-1, tbl. A ¶ 88.   Plaintiffs point to a memorandum from the Special Aide to the Administrator dated August 13, 2004, stating that "all management job postings pending to be issued … shall be issued internally in order not to affect the related budgetary items."   ECF No. 206-21, at 1. Corcino, however, had already begun her position almost two months earlier.   Burgos was selected to occupy her position effective almost four years later within the OCC, an office that did not even exist at the time of the memorandum.   Moreover, neither of the documents authorizing their positions indicate that the job posting could be done internally.   See ECF Nos. 193-1, ¶¶ 12, 22, 24, 89–90, 156; 206-1, ¶¶ 12, 22, 24, 89–90, 156; 206-2, ¶¶ 57, 66; 216-1, tbl. A ¶¶ 89–90, 156, tbl. B ¶¶ 57, 66; 244, tbl. A ¶¶ 89–90, tbl. B ¶ 66.

The González-Segarra court indicates that the positions held by the plaintiffs "are not positions difficult to recruit, nor do they present a particularity that requires limiting the competition."  2013 WL 1395853, at *23.  Plaintiffs assert that "[t]he present case deals with a position of difficult recruitment" and that "plaintiff's position was one of difficult recruitment." ECF No. 206, at 30, 33.  Nevertheless, plaintiffs do not point to any particular evidence in the record to support such an assertion.  González-Segarra requires that "[t]he record … justify" such a finding and there be "pro[of] that there was a need to depart from the mechanism of open competition, a guarantee that the appointments and promotions were done through merit and not through cronyism."  2013 WL 1395853, at *23.  In making its determination that none of the positions held by plaintiffs "require[d] a particular experience tied to the specific duties that would be carried out," the court "review[ed] the eligibility requirements of the job announcements for the positions."  Id. at *20.  The González-Segarra court also noted that, "within the broad field of persons who are in search of work, there may be one or more with the qualifications necessary to apply for those positions."  Id.  Similarly, in this case, it is uncontested that the minimum requirements for plaintiffs' positions did not include being an employee of or having experience in the SIFC.  Moreover, it is undisputed that there are people who are not employed by the SIFC who meet the minimum requirements for said positions.  See ECF Nos. 193-1, ¶¶ 152–53, 157–58; 206-1, ¶¶ 152–53, 157–58; 216-1, tbl. A ¶¶ 153, 158; 244, tbl. A ¶¶ 153, 158.

In order for the appointments to be valid, there must have been "a need to depart from the mechanism of open competition, a guarantee that the appointments and promotions were done through merit and not through cronyism."  González-Segarra, 2013 WL 1395853, at *23.  An internal job posting is impermissible "without there being anything in the record that justifies it."

Id. at *20.  In this case, the record "is devoid of any determination on the part of the appointing authority that justifies why external competition was excluded for the positions at issue."  Id. Like in González-Segarra, "[a] study of the record" in this case "does not show any analysis on the need for those positions to be announced internally due to the particularities of the work to be done."  Id.

In their discussion on González-Segarra, plaintiffs state that "Corcino does not belong to any group of employees who appealed before the SIFC Board of Appeals."  ECF No. 206, at 30. Plaintiffs, however, do not explain how such a fact distinguishes Corcino's case from that of the González-Segarra plaintiffs.  González-Segarra is cited herein for its analysis of the interaction between the SIFC Personnel Regulations and the mechanism of internal job postings.  It is not readily apparent how a plaintiff's failure to appeal the nullification of her appointment, which occurred in 2010, is relevant to the determination of whether the appointment itself, which occurred in 2008, complied with the Personnel Regulations.  Since a reasonable jury could not conclude that plaintiffs' appointments were made in compliance with Section 14.1 of the Personnel Regulations, plaintiffs' due process claims must be dismissed.[13]

## B.    Political Discrimination Claims

### 1.    Statute of Limitations

Defendants argue that discriminatory conduct alleged by plaintiffs occurring more than one year before the filing of the instant complaint is barred by the applicable statute of limitations.  See Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 28–29 & n.3 (1st

---

[13] In support of their proposition that their appointments were valid, plaintiffs also cite a decision by the Puerto Rico Court of Appeals.  See Ortiz Torres v. Álvarez Rubio, No. KLAN201101018, 2012 WL 2373421 (P.R. Cir. May 31, 2012).  As discussed above, however, the analysis in González-Segarra is directly applicable to the instant case.  See Casiano-Montañez, 707 F.3d at 129 (requiring a stay of proceedings in a factually similar case pending the Puerto Rico Supreme Court's decision in González-Segarra).  Not only is González-Segarra a more recent decision than Ortiz Torres, it is by a court of higher authority.  Finally, no translation of Ortiz Torres has been provided to the court by either plaintiffs or defendants, so the court has not been placed in a position to consider it.  See Puerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008).

Cir. 2012).  Nevertheless, "incidents apparently fall[ing] outside the limitations period … can be used as 'background evidence' to support [plaintiffs'] timely claims." Rodríguez v. Municipality of San Juan, 659 F.3d 168, 177 n.5 (1st Cir. 2011).  Such incidents "do[] not provide a basis for damages," but they "shed light on the impact of [defendants'] later [conduct]." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 142 (1st Cir. 2009); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

Plaintiffs acknowledge that "the employment adverse action that constitutes the crux of the present complaint is Plaintiffs' respective dismissal and demotion," ECF No. 206, at 41–42, not defendants' earlier conduct.[14]  Thus, actions taken by defendants before the nullification of plaintiffs' appointments do not constitute "challenged employment action[s]" for purposes of the prima facie case. Martínez-Vélez, 506 F.3d at 39.  Rather, they are presented as background evidence to support plaintiffs' contention that their political affiliations were substantial or motivating factors behind the nullification of their appointments.  As such, the statute of limitations does not prevent the consideration of such evidence.

### 2.   **Mt. Healthy** Defense

It is plaintiffs' contention that their SIFC appointments were rendered null and void by Álvarez because of their affiliation with the PDP.  "But even if a jury could reasonably conclude from the summary-judgment evidence that [their] political affiliation was a substantial or motivating factor" in the nullification of their appointments, "defendants could still meet their summary-judgment burden by showing that no sensible jury would reject their defense that they would have taken the same action against him in the absence of the protected conduct." Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 5 (1st Cir. 2012) (internal quotation omitted) (citing,

---

[14] Corcino and Burgos received the letters indicating the intent to nullify their appointment and promotion, respectively, on January 8, 2010.  ECF Nos. 193-5; 193-7.  The instant complaint was filed on May 14, 2010, well within the one-year limitations period.

*inter alia*, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).  Under Mt. Healthy, a "defendant is given the opportunity to establish that it would have taken the same action regardless of the plaintiff's political beliefs …."  Padilla-García, 212 F.3d at 74.  The Mt. Healthy defense "deals with employment actions driven by 'mixed motives,' and provides that where there are both 'lawful' and 'unlawful' reasons for the adverse employment action, 'if the lawful reason alone would have sufficed to justify the [action],' then the employee cannot prevail."  Id. at 6 (quoting McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 359 (1995)).  In other words, summary judgment is appropriate if "the record … shows that the defendants would have [nullified plaintiffs' appointments] even if [they] were [NPP] member[s] or sympathizer[s]."  Id.

A review of First Circuit precedent on this issue shows that a finding of summary judgment for defendants in this case is appropriate.  One analogous case is Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 26 (1st Cir. 2006).  In Aguiar-Carrasquillo, "immediately after the administration change following the PDP victory in the 2000 elections, … defendant … directed [an external investigator] to conduct an 'audit' of all recent employment actions to evaluate their compliance with [the] Personnel Regulations" of Puerto Rico's Government Development Bank ("GDB").  445 F.3d at 25.  The investigator found several irregularities with respect to plaintiffs' respective appointments.  As such, their appointments were nullified.  One of the plaintiffs was terminated, whereas the other was reinstated to a previous position.

The court held that, "even if [one of the plaintiffs] had made a prima facie case for political discrimination, defendants have presented a legitimate, non-discriminatory explanation for her termination—namely, that her appointment violated [the entity's] Personnel Regulations."  Id. at 26–27.  Similarly, defendants in this case argue that the appointments of

Corcino and Burgos violated the SIFC's Personnel Regulations, a contention which, as discussed above, has been sustained by the Puerto Rico Supreme Court under similar circumstances.

The Aguiar-Carrasquillo plaintiffs also claimed that the "audit was 'selective' because it only affected NPP members."  Id. at 25–26.  The court held that, even if such a claim were valid, it would not be consequential, indicating that:

> [i]f uniformly applied personnel practices, predicated on legitimate reasons, result in terminations, those terminations are not unconstitutional because those affiliated with one political party are disproportionately impacted.  It is in the nature of a change in administrations that job actions by the new party in power will have a disparate impact on members of the outgoing party.

Id. at 26 (quoting Sánchez-López v. Fuentes-Pujols, 375 F.3d 121, 140 (1st Cir. 2004)); see also Montfort-Rodríguez v. Rey-Hernández, 504 F.3d 221, 228 (1st Cir. 2007); Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 154 (1st Cir. 2006).

In their discussion of Aguiar-Carrasquillo, plaintiffs merely state that "the personnel practices [must be] uniformly applied, predicated on legitimate reasons," without attempting to distinguish the case.  ECF No. 206, at 48.  Nevertheless, as discussed above, the uncontested evidence demonstrates that the audit was uniformly applied and predicated on legitimate reasons.  It is undisputed that every SIFC personnel file was evaluated in the audit and, without exception, every appointment made between 2003 and 2009 through the mechanism of internal job postings was nullified.  Moreover, unlike in Aguiar-Carrasquillo, it is uncontested that the appointments of twenty-five employees unaffiliated with plaintiffs' political party were nullified as a result of the SIFC audit.  Sixteen of these employees were affiliated with the NPP.  ECF Nos. 193-1, ¶¶ 57–59; 206-1, ¶¶ 57–59; 216-1, tbl. A ¶¶ 57–59; 244, tbl. A ¶¶ 57–59.  Even if it is a reasonable inference that the audit had "a disproportionate impact" on employees affiliated with the PDP, ECF No. 206, at 44, such a consideration has been rejected as dispositive by the First Circuit.

Vélez-Rivera also involved the audit conducted by the new PDP leadership at the GDB following the 2000 elections.  Plaintiffs contend that Vélez-Rivera is "distinguishable" because "the central issue … was the validity of the independent contactor's role in an audit."  ECF No. 206, at 48.  Although in Vélez-Rivera the individual who conducted the audit was an independent contractor, rather than the Director of Human Resources as in this case, the relevance of this distinction is not readily apparent.  In Vélez-Rivera, the court affirmed the grant of summary judgment based on the defendants' Mt. Healthy defense.  437 F.3d at 154.  The court pointed out that it was undisputed that the plaintiff was unqualified for the appointment and that the audit assessed the legality of all personnel transactions within the given time frame.  The court, as in Aguiar-Carrasquillo, rejected the argument that an audit which "disproportionately impact[s]" one political party defeats an otherwise valid Mt. Healthy defense.  Id. (internal quotation omitted).  As discussed above, all of these considerations are applicable in the case of caption.  Plaintiffs' appointments were invalid under SIFC regulations, as the rationale of González-Segarra applies.  The audit was comprehensive and applied without exception.  The existence of disproportionate impact is insufficient to bring a case of political discrimination to trial.

Yet another analogous case from the First Circuit is Soto-Padró.  Over the course of a restructuring of Puerto Rico's Public Buildings Authority, the Soto-Padró plaintiff ended up in an inferior position, which he claimed was due to his membership in the NPP.  The defendant contended that it would have taken the same action against him due to its restructuring plan.  The court held that summary judgment had been appropriate based on defendant's Mt. Healthy defense.  A comparison between the reorganization in Soto-Padró and the audit in the instant case is warranted.

Both the reorganization in <u>Soto-Padró</u> and the audit in this case were "entity-wide" and "not … targeted exclusively at [plaintiffs'] particular corner of the [entity]."  675 F.3d at 6. Here, it is uncontested that the audit encompassed the personnel files of all 3,835 employees of the SIFC.  ECF Nos. 193-1, ¶ 40; 206-1, ¶ 40; 216-1, ¶ 40; 244, ¶ 40.  Moreover, the audit was not targeted exclusively at the OCC.  Both the reorganization and the audit "focused on positions not persons."  <u>Soto-Padró</u>, 675 F.3d at 6.  Although the list of affected personnel transactions in the Audit Report includes the names of the employees in question, ECF No. 193-26, at 18–34, the criterion by which an appointment was included in the list was whether it was made pursuant to an internal job posting, not on individual considerations.  While the restructuring and audit were implemented by individuals of opposing political affiliation, "the people affected" by the audit "included NPP *and* PDP sympathizers."  <u>Soto-Padró</u>, 675 F.3d at 6 (emphasis in original). It is uncontested that each personnel transaction in which career managerial employees were appointed through internal job postings between 2003 and 2009 was nullified by Álvarez.  No exceptions were made.  In <u>Soto-Padró</u>, one "PDP-sympathizer employee" who, like the NPP-affiliated plaintiff, was negatively affected by the reorganization was identified by name.  675 F.3d 6.  In contrast, in this case, twenty-five employees who were affected by the audit, but unaffiliated with plaintiffs' party, are identified by name.  <u>See also</u> <u>Morales-Santiago v. Hernández-Pérez</u>, 488 F.3d 465, 471 (1st Cir. 2007) (finding summary judgment on <u>Mt. Healthy</u> defense appropriate where "there was no material dispute that the plaintiffs' previous salary raises did not comport with Puerto Rico law, and that the new administration's adjustments corrected the inflated salaries by reducing them to the levels appropriate for their respective positions").

One distinction between the reorganization in Soto-Padró and the audit in this case is that the former was "green-lighted" by the entity's governing board, whereas there is no evidence of a comparable approval by the SIFC Board of Directors in this case.  675 F.3d at 6.  The Soto-Padró court raised this factual consideration in order to contrast a case where the First Circuit rejected summary judgment on the defendant's Mt. Healthy defense.  See Rodríguez-Ríos v. Cordero, 138 F.3d 22 (1st Cir. 1998).  In Rodríguez-Ríos, the court pointed out that "all previous reorganization plans" at the entity in question had been "reviewed or approved by the Governing Board" and that the plan in question "was simply marked 'Confidential and Privileged.'"  Id. at 25–26.  Rather than seeking the Governing Board's approval, there was evidence that the defendant "bypass[ed] the … Governing Board before proceeding with the 'reorganization' plan."  Id. at 26.  Without evidence to substantiate a "nondiscriminatory motive" for such a circumvention of the Governing Board, the Rodríguez-Ríos court rejected the Mt. Healthy defense.  Id.  Thus, the Soto-Padró distinguished Rodríguez-Ríos on the grounds that "the governing board had not 'approved' that plan, as it had earlier ones."  675 F.3d at 6 (emphasis added).  Unlike in Rodríguez-Ríos, no evidence has been presented that every previous audit at the SIFC had been reviewed or approved by the Board of Directors.  Nor is there any evidence that, by ordering the audit, Álvarez was bypassing the Board of Directors.  Moreover, in both Aguiar-Carrasquillo and Vélez-Rivera, summary judgment was found to be appropriate, even though no mention is made in the opinion as to whether the audit had been approved by the entity's governing board.

Moreover, cases from the First Circuit rejecting summary judgment on a defendant's Mt. Healthy defense do not compel a denial of the pending motion.  In Montfort-Rodríguez v. Rey-Hernández, 504 F.3d 221 (1st Cir. 2007), the court found summary judgment to be inappropriate,

pointing to "[t]he absence of evidence of a comprehensive or carefully studied effort at reform" in order to "distinguish[] this case from a number of others in which we have rejected claims of political discrimination following a change in administration." 504 F.3d at 228. In particular, the Montfort-Rodríguez court observed that there had been no "audit of all recent employment actions to evaluate … compliance with department regulations," no "review of the personnel files of all 1,300 or so municipal employees," no "audit to assess the legality of all personnel transactions during a particular period," and no "audit of [defendants'] Human Resources Department following the change in administration." Id. (distinguishing Aguiar-Carrasquillo, 445 F.3d at 26; Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 26 (1st Cir. 2004); Vélez-Rivera, 437 F.3d at 149; González-De-Blasini v. Family Dep't, 377 F.3d 81, 84 (1st Cir. 2004)). The case of caption involves an audit conducted of all 3,835 personnel files at the SIFC, clearly within the purview of the cases distinguished by the Montfort-Rodríguez court.

In Padilla-García v. Guillermo Rodríguez, 212 F.3d 69 (1st Cir. 2000), the court found that defendants were not entitled to summary judgment on their Mt. Healthy defense. The record had not established that "others in the municipal government were also terminated as a result of the restructuring." Padilla-García, 212 F.3d at 78. As stated by the Soto-Padró court, Padilla-García was distinguishable on the grounds that, in the latter case, "the 'restructuring' … had scrapped one job but not others." 675 F.3d at 6. In this case, Corcino and Burgos were not the only SIFC employees whose appointments had been nullified as a result of the audit ordered by Álvarez. It is undisputed that 232 employees were annulled by the audit. As such, Padilla-García is also distinguishable.

The Soto-Padró court also distinguished Jirau-Bernal v. Agrait, 37 F.3d 1, 3 (1st Cir. 1994) and Rodríguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 40 (1st Cir. 1993), because, in those

cases, "every single one of the employees demoted under the 'reorganization' schemes there was a supporter of the political party that opposed the party in power."  675 F.3d at 6.  In contrast, here, it is uncontested that the appointments of twenty-five SIFC employees unaffiliated with the PDP—sixteen of whom were affiliated with the NPP—were nullified as a result of the audit.

In Acevedo-García v. Vera-Monroig, 204 F.3d 1 (1st Cir. 2000), the First Circuit held that the district court's determination that there was "a triable issue of fact regarding a potentially discriminatory application of the Layoff Plan" was not erroneous.  204 F.3d at 11 (internal quotation omitted).  For instance, there were contested facts about whether the municipality "always observe[d] the plan's seniority criteria" when taking "actions … pursuant to the layoff plan."  Id. at 5.  In this case, however, it is undisputed that, without exception, every personnel transaction in which career managerial employees were appointed through internal job postings between 2003 and 2009 was nullified.  Similarly, the First Circuit in Sánchez-López, which involved an appeal from a jury verdict finding political discrimination, pointed out that summary judgment is not warranted where "defendants have not uniformly applied a neutral basis, such as illegality of appointment, for taking employment actions, but rather have taken action against members of the opposing party but not against similarly situated members of defendants' own party."  375 F.3d at 132 (citing Acevedo-García, 204 F.3d at 10–11).  Nevertheless, summary judgment is appropriate where, as here, "plaintiffs ha[ve] no evidence of differential treatment in the personnel actions taken against those who were illegally appointed."  Id. (citing Kauffman, 841 F.2d at 1172).

In Rodríguez-Marín v. Rivera-González, 438 F.3d 72 (1st Cir. 2006), it was determined that evidence was sufficient for the jury to reject defendants' Mt. Healthy defense.  At trial, there had been "conflicting evidence as to the legality of plaintiffs' appointments," including

testimony from the director of recruitment that the appointments were legal. Rodríguez-Marín, 438 F.3d at 82. As discussed above, however, under the analysis in González-Segarra, the appointments in this case were invalid under Puerto Rico law.

Finally, at least one other case in this district has reached the same conclusion. See Reyes-Pérez v. State Ins. Fund, Civ. No. 11-1070 (JAF), 2012 WL 4863714 (D.P.R. Oct. 12, 2012), reconsideration denied, 2013 WL 607918 (D.P.R. Feb. 19, 2013). Like this case, Reyes-Pérez involved the audit of 3,835 personnel files commissioned by Álvarez. The court, without deciding whether plaintiff met his *prima facie* burden, held that "defendants still would have reclassified Plaintiff's position even if he were an NPP member, which means that they have sufficiently established a Mt. Healthy defense." Id. at *6 (internal quotation and alterations omitted). Relying primarily on Soto-Pedró, the Reyes-Pérez court pointed out that the audit affected members of both parties, focused on positions rather than persons, and extended to every personnel file at the SIFC. Id. In light of the foregoing analysis of the evidence submitted before the court in this case, it is clear that no reasonable jury could find that political discrimination "constitute[d] a 'but for' cause" for the nullifications of plaintiffs' appointments. Jirau-Bernal, 37 F.3d at 4.[15]

### C.      Supplemental Claims

Federal courts may decline to exercise supplemental jurisdiction over a plaintiff's state law claims when the federal claims that gave it original jurisdiction are dismissed. See 28 U.S.C. § 1367(c)(3); González-De-Blasini v. Family Dept., 377 F.3d 81, 89 (1st Cir. 2004); Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998). If all federal claims are dismissed prior to trial, then the state law claims "'should be dismissed as well.'" Rodríguez v. Doral Mortg. Corp., 57

---

[15] As such, it is unnecessary to address the qualified immunity defense submitted by Álvarez in her personal capacity.

F.3d 1168, 1177 (1st Cir. 1995) (quoting <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966)). Because defendants are entitled to summary judgment on plaintiffs' federal claims, their state law claims are dismissed without prejudice.  See <u>Dávila-Feliciano v. Puerto Rico State Ins. Fund Corp.</u>, 754 F. Supp. 2d 351, 367 (D.P.R. 2010).

**V.**     **CONCLUSION**

Based on the foregoing analysis, defendants' motion for summary judgment (ECF No. 192) is hereby **GRANTED**.  Plaintiffs' claims of due process under the Fourteenth Amendment and political discrimination under the First Amendment are hereby **DISMISSED WITH PREJUDICE**, whereas plaintiffs' claims under Puerto Rico law are **DISMISSED WITHOUT PREJUDICE**.

   **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of August, 2013.

s/Marcos E. López
U.S. Magistrate Judge
